**Application of William H. PLUMB.**
**Patent Appeal No. 8781.**

United States Court of Customs and Patent Appeals.

Jan. 26, 1973.

William H. Plumb, Robert F. Hause, Buffalo, N. Y., attorneys of record, for appellant; James W. Dent, Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, sustaining the examiner's rejection of claim 11 of appellant's application,[1] on the basis of certain prior art.

*The Invention*

Appellant's invention relates to polyurethane foams, made from polyisocyanates and polyols, in which polyols derived from polyester or polyester resins, which have normally been used, are partially or totally replaced by "an alkylene oxide adduct of a substantially aliphat-

1. Serial No. 537,688, filed March 28, 1966.

ic-hydrocarbon-insoluble pine wood resin." It appears from the record that prior to the present invention appellant's assignee had used aliphatic-hydrocarbon-insoluble pine wood resin, which is relatively low in cost, to replace part of the relatively expensive polyester or polyether resins generally used in the reaction. According to appellant's specification, however,

> [s]uch naturally occurring wood resins, which contain carboxyl and phenolic hydroxyl groups, suffer from the disadvantage * * * that the carboxyl and phenolic hydroxyl groups are considerably less reactive than the hydroxyl groups of the polyether and polyester resins generally used in the polyurethane reaction mixture. Due to this lack of reactivity, it is extremely difficult to react these carboxyl and phenolic hydroxyl groups of the wood resins with the isocyanate groups within the short period of time encountered in the actual foaming operation. * * * Accordingly, due to this lack of reactivity of the carboxyl and phenolic hydroxyl groups, it is not practical to use these naturally occurring wood resins to wholly or partially replace the polyol in the resin pre-mix portion of the reaction mixture, or to use a substantial amount of the wood resin in the preparation of urethane foams by the one-shot technique.

Appellant subjects the aliphatic-hydrocarbon-insoluble wood resin to an "oxyalkylation" reaction, and uses the reaction product to replace the generally used polyester and polyether resins. The specification compares the reaction product with unmodified pine wood resin as follows:

> The oxyalkylated pine wood resin is more reactive and readily reacts with

isocyanate groups to form urethane polymers within a relatively short period of time. As a result, the oxyalkylated pine wood resin, which is substantially lower in cost than polyether and polyester resins, may be used as the sole polyol component in the production of polyurethane foam by both the semi-prepolymer and one-shot techniques.

The specification also states:

> Ethylene oxide, propylene oxide and epichlorohydrin are generally preferred as the alkylene oxide which is reacted with the aliphatic[-]hydrocarbon-insoluble pine wood resin to form the oxyalkylated resin, for these oxides are readily available commercially and form an oxyalkylated resin which has a handleable viscosity when heated to about 300°F. Other alkylene oxides capable of oxyalkylating the pine wood resin may, of course, be used provided that the resulting oxyalkylated pine wood resin, upon being heated to temperatures of about 300°F, has a viscosity such that the resin may be pumped and mixed.

Claim 11, the sole claim remaining in the case, reads as follows:

> 11. A polyurethane foam comprising the reaction product of an organic polyisocyanate and a polyol containing a plurality of hydroxyl groups, in the presence of a blowing agent, wherein up to 100% of said polyol is an alkylene oxide [2] adduct of a substantially aliphatic-hydrocarbon-insoluble pine wood resin.

### The Rejection

The prior art relied on by the examiner is a patent to Delmonte.[3] Delmonte discloses polyurethane foams in which the polyol component is a mixture of

---

**2.** In his answer, the examiner complained that epichlorohydrin was not strictly speaking an alkylene oxide. The board noted this discrepancy, but, since there was no rejection based on 35 U.S.C. § 112 before it, considered the term "alkylene oxide" as having the broader meaning

ascribed to it by appellants, for the purposes of considering the appeal. We shall do likewise.

**3.** U.S. Patent No. 3,356,622, issued December 5, 1967, on an application filed December 31, 1963.

conventional polyols and an oxyalkylated petroleum-hydrocarbon-insoluble pine wood resin. The resin is oxyalkylated by reaction with either ethylene oxide or propylene oxide. The sole question before us is whether a showing made by appellants under Patent Office Rule 131 is sufficient to antedate the Delmonte reference.

The Rule 131 showing included two affidavits by appellant Plumb, an affidavit by one Walter E. Voisinet, who was apparently appellant's immediate supervisor at the time of invention, and a number of documentary exhibits. Exhibit A is a letter from Plumb to Voisinet entitled "Attempted Oxyalkylation of Vinsol." Vinsol is identified in appellant's specification as an aliphatic-hydrocarbon-insoluble pine wood resin. Exhibit A describes the reaction of Vinsol with epichlorohydrin and the use of the resulting adduct in the preparation of a foam. That foam is compared with another foam, whose composition was the same, except the latter foam was made with Vinsol which had not been reacted with epichlorohydrin. Exhibit B is a memorandum of invention entitled "Oxyalkylation of Vinsol." The text of the memorandum reads as follows:

> Vinsol is a resin derived from Southern Pine Wood, having an [sic] reactivity No. of from 84 (By NCO Acid Nos.) to 284 (By Zerewitinoff Method). It is known that these Hydroxyl groups are principally phenolic in character. Phenolic novolacs have been oxyalkylated commercially for several years.

> We propose as an invention, the oxyalkylation of vinsol (either or both of the Hydroxyl and Carboxyl groups). The oxyalkylation may be accomplished through the use of agents such as ethylene oxide, propylene oxide or epichlorohydrin. We also propose to aminate vinsol with agents such as ethylene imine to give products reactive to isocyanates.

Exhibit C is another letter from Plumb to Voisinet, which describes the reaction of Vinsol with epichlorohydrin. Exhibits D through O are copies of notebook pages dealing with the experiments described in Exhibit A. The dates of Exhibits A through O are all alleged to be prior to the critical date. Exhibit P is a copy of "The Carwin Company Technical Bulletin," dated April, 1962. Exhibit P was cited to "show a small portion of what was well known in the period prior to December 31, 1963 [the filing date of the Delmonte patent]."

One of the Plumb affidavits states:

> The facts surrounding my conception and reduction to practice are the following. My employment with National Gypsum Company started in 1962, and from the start of said employment throughout the period ending December 31, 1963, I was employed almost solely in research and development related to rigid polyurethane foam. Prior to the start of my said employment, National Gypsum Company had commenced using an aliphatic-hydrocarbon-insoluble pine wood resin, commonly known as Vinsol, in substantially all of the regular production of its rigid polyurethane foam.

The Plumb affidavits describe the Exhibits, stating the following about appellant's memorandum of invention:

> This Exhibit B sets forth my recognition at that time of the oxyalkylation of Vinsol with ethylene oxide, propylene oxide or epichlorohydrin. From the other documents submitted it can be seen that my work regarding the oxyalkylation of Vinsol, as referred to in Exhibit B, was a first step in the preparation of polyurethane foam, and I can herein state that this concept in Exhibit B was solely related to preparation of polyurethane foam.

The Voisinet affidavit states that "from the said start of employment until December 31, 1963, said Dr. Plumb was responsible directly to me and was engaged substantially solely in research and development related to rigid polyurethane foam." Concerning the memo-

randum of invention, the Voisinet affidavit states:

> That the Memorandum of Invention * * * was read and understood by me and signed by me after the word "Witnesses", all said acts being contemporaneous with the preparation of the document and signing by said Dr. Plumb, all prior to December 31, 1963, and that I then clearly understand the disclosure therein as being directed to oxyalkylation of Vinsol, using ethylene oxide, propylene oxide or epichlorohydrin, for the sole purpose of incorporating the end product thereof as an ingredient in polyurethane foam. This was an obvious deduction for me at the time from what was stated in the said disclosure in view of the fact National Gypsum Company was then using Vinsol as an ingredient in commercial production of its polyurethane foam and the fact that research and development relative to polyurethane foam was known to me to be Dr. Plumb's sole work. Further, this was then clearly known to me as a result of contemporaneous discussions which I had with said Dr. Plumb regarding this said invention.

The board considered that appellant's showing was, at best, sufficient to show the prior reduction to practice of a polyurethane foam made with the reaction product of epichlorohydrin and Vinsol. It was noted that no reduction to practice of the species of the invention relating to the ethylene oxide and propylene oxide adducts had been shown. With regard to appellant's memorandum of invention, the board pointed out that that document "does not refer to polyurethanes at all." Further, nothing was presented to suggest that the ethylene oxide, propylene oxide and epichlorohydrin adducts would be similar in properties or that polyurethane foams prepared with those adducts would be expected to give equivalent results. The board considered the intent to use those adducts in polyurethane foams to be only "vaguely indicated" in the affidavits. The board concluded that appellants'

showing was insufficient to establish possession of the invention as it relates to the ethylene oxide and propylene oxide adducts prior to Delmonte's effective date.

### Opinion

Appellant takes the position that his reduction to practice of the epichlorohydrin aspect of the invention, when considered with the contemporaneous discussion of the preparation of the ethylene oxide, propylene oxide and epichlorohydrin adducts of Vinsol, and further considered with the affidavit evidence and contemporaneous evidence of appellant's intent to utilize all three adducts to make polyurethane foam, is sufficient to establish that appellant was in possession of the generic invention, or at least as much of the generic invention as is disclosed by Delmonte, prior to the effective date of that reference. See In re Stempel, 241 F.2d 755, 44 C.C.P.A. 820 (1957). Appellant refers (1) to the statement concerning aminated Vinsol in his memorandum of invention, and (2) the generic "oxyalkylation" terminology used in connection with the reduction to practice of the foam containing the epichlorohydrin adduct, as bolstering the evidence of his intent. Appellant's brief states:

> In summary, appellant contends the documents to deal with the three adducts, and with the subject of [o]xyalkylation in general with a clear indication that equivalency can be expected. * * *

We have fully and carefully considered all of the evidence presented in appellant's Rule 131 showing in the light of appellant's arguments, but we are convinced that the board did not commit reversible error in finding appellant's showing to be insufficient. The difficulty with appellant's case is that his showing contains no "clear indication that equivalency [could have been] expected" at any time prior to the effective date of Delmonte. As the board pointed out, appellant did not present any direct evidence concerning what

similarities in properties might have been expected between the epichlorohydrin adduct on the one hand and the ethylene oxide and propylene oxide adducts on the other hand. More important, in view of the invention *claimed*, is the fact that no direct evidence has been submitted on what similarities might have been expected between *foam* made with epichlorohydrin adduct and *foams* made with the ethylene oxide or the propylene oxide adduct.

The Rule 131 showing in this case is insufficient to establish that the foam made with the epichlorohydrin adduct—the one species which was reduced to practice—provided an adequate basis for inferring that the invention had generic applicability. *Cf.* In re Da Fano, 392 F.2d 280, 284, 55 C.C.P.A. 1134, 1139 (1968); citing In re Rainer, 390 F.2d 771, 55 C.C.P.A. 853 (1968). We can glean from the materials presented that appellant considered ethylene oxide, propylene oxide and epichlorohydrin to be similarly reactable with Vinsol, and we can accept appellant's allegation that the concept in the memorandum of invention was solely related to preparation of polyurethane foam. However, we cannot assume that similarities in properties among those three compounds would be expected to survive (1) reaction with a substantially aliphatic-hydrocarbon-insoluble resin and (2) a reaction between the resulting product and an organic polyisocyanate, to result in foams having similarly useful properties. *Cf.* In re Rainer, *supra*, 390 F.2d at 775, 55 C.C.P.A. at 857. Since no substantial evidence was presented that that would have been the case, the Rule 131 showing was insufficient to overcome the Delmonte reference, and the decision of the board must be affirmed.

Affirmed.